CONSOLIDATION COAL COMPANY,
Petitioner

v.

WORKERS' COMPENSATION
APPEAL BOARD (ALBANI),
Respondent.

Commonwealth Court of Pennsylvania.

Argued Oct. 14, 2008.
Decided March 5, 2009.
Reargument En Banc Denied
April 29, 2009.

**816**

Paul E. Sutter, Pittsburgh, for petitioner.

Stephen P. Moschetta, Washington, for respondent.

BEFORE: McGINLEY and COHN JUBELIRER, JJ, and KELLEY, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

Consolidation Coal Company (Employer) petitions for review of the order of the Workers' Compensation Appeal Board (Board), which reversed, in part, the order of the workers' compensation judge (WCJ) and granted the Petition for Review of Compensation Benefits Offset (Review Petition) of Donald Albani (Claimant). The Board held that the actuarial testimony presented by Employer was not sufficient to support Employer's right to an offset due to Claimant's receipt of a multi-employer defined benefit disability pension because the testimony did not conform to the requirements of the Bureau of Workers' Compensation's (Bureau) regulation at 34 Pa.Code § 123.10[1] and Section 204(a) of the Workers' Compensation Act (Act).[2]

1. The Bureau's regulation at 34 Pa.Code § 123.10 states, in relevant part:

(a) When the pension benefit is payable from a multi-employer pension plan, only that amount which is contributed by the employer directly liable for the payment of workers' compensation shall be used in calculating the offset to workers' compensation benefits.

(b) To calculate the appropriate offset amount, the portion of the annuity purchased by the liable employer's contributions shall be as determined by the pension fund's actuary. The ratio of the portion of the annuity purchased by the liable employer's contributions to the total annuity shall be multiplied by the net benefit received by the employe from the pension fund on a weekly basis. The result is the amount of the offset to be applied to the workers' compensation benefit on a weekly basis. 34 Pa.Code § 123.10(a)-(b).

2. Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 71(a). This section provides, in relevant part:

On the basis of our decision in *Pennsylvania State University v. Workers' Compensation Appeal Board (Hensal)*, 911 A.2d 225 (Pa.Cmwlth.2006) (en banc), we reverse and remand this matter to the Board for further proceedings.

Employer was a contributing employer to the UMWA Health & Retirement Funds' 1974 Pension Plan (Plan). Prior to working for Employer, Claimant had worked approximately seventeen and a half years for other employers who were contributors to the Plan. Claimant suffered a work-related injury while working for Employer on January 31, 2002. Claimant began receiving workers' compensation benefits at the rate of $662.00 per week. Claimant applied for a multi-employer defined benefit[3] disability pension from the Plan, which was awarded in February 2003. At that time, the Plan paid Claimant a $17,061.44 back payment. This sum constituted pension payments for the period between February 1, 2002 and the date on which the pension was awarded. After taxes, Claimant received $13,649.16 of the back payment. Claimant began receiving monthly pension payments of $1,386.37, less $200.00 for income tax and $6.00 in union dues, for a net total of $1,180.37. Claimant reported these benefits to Employer.

> The severance benefits paid by the employer directly liable for the payment of compensation and the benefits from a pension plan *to the extent funded* by the employer directly liable for the payment of compensation which are received by an employe shall also be credited against the amount of the award made under sections 108 and 306, except for benefits payable under section 306(c).
> *Id.* (emphasis added).

**3.** The Bureau's regulations define a "defined-benefit plan" as "[a] pension plan in which the benefit level is established at the commencement of the plan and actuarial calcula-

Employer, on August 9, 2004, issued a Notice of Workers' Compensation Benefits Offset (Offset Notice). (WCJ Decision, Findings of Fact (FOF) ¶ 3.) In the Offset Notice, Employer stated its intention to take a $139.74 weekly credit against Claimant's weekly benefit due to Claimant's receipt of the pension. (FOF ¶ 3.) Employer also asserted that, due to Claimant's receipt of the back payment, Claimant had received a $18,485.60 overpayment of his workers' compensation benefits. (FOF ¶ 3.) Employer notified Claimant that it was suspending his workers' compensation benefit payments for thirty-five weeks and taking a deduction of $206.50 from the subsequent check in order to recoup this overpayment.

In response, on August 10, 2004, Claimant filed his Review Petition. The matter was assigned to the WCJ, who held hearings at which Claimant presented his own testimony as well as that of Dale Stover, the comptroller of the Plan. Employer presented the testimony of Carol Gramer, the actuary of the Plan.

The WCJ found Ms. Gramer's testimony credible and made the following relevant findings:

> d. Ms. Gramer uses a "service-based" methodology to determine how much

tions determine the varying contributions necessary to fund the benefit at an employe's retirement." 34 Pa.Code § 123.2. This is in contrast to a "defined-contribution plan," which the Bureau's regulations define as:

> A pension plan which provides for an individual account for each participant and for benefits based solely upon the amount of accumulated contributions and earnings in the participant's account. At the time of retirement the accumulated contributions and earnings determine the amount of the participant's benefit either in the form of a lump-sum distribution or annuity.
> 34 Pa.Code § 123.2.

a particular employer contributed to the pension.

e. Ms. Gramer noted that the claimant has a total credited service of 31.25 years.

f. The total service the claimant had with [Employer] was his last 13.75 years.[4] Ms. Gramer determined by looking at the benefit rate applicable for each of the years the claimant worked for [Employer], [that the monthly benefit attributed to Employer was] $708.73.... Ms. Gramer noted that this amount represents 51.12% of the claimant's total monthly benefits.[5]

. . . .

i. Ms. Gramer agreed that she was not giving a literal interpretation to Title 34 Section 123.10(a) to mean that the actual amount of money contributed by the employer should be used in calculating the offset. Instead, it was Ms. Gramer's opinion that this section meant that the actuary cannot attribute to the last employer any benefits that would be attributable to service with a prior employer. Ms. Gramer pointed out that a literal interpretation might make sense if this plan was a defined contribution plan, but it is not. Ms. Gramer noted that she would not consider actual money paid into the plan to be a viable alternative

to calculate employer's contribution in this type of plan.

(FOF ¶¶ 7 (d-f, i).) The WCJ characterized Mr. Stover's testimony as follows:

d. Mr. Stover determined that the amount of money [Employer] actually remitted to the plan during the period that the claimant worked for [Employer] can be arrived at by taking total credit hours reported by the employer and the total income hours inferred from the total amount of hours for each of the periods remitted for the claimant and multiplied that by a rate corresponding to the given period. The inference is necessary because there is not any direct account of income for "Mr. Albani". Contributions are made on a company basis, not on an individual basis.

. . . .

g. Mr. Stover has not made any calculations in this particular case as to how much of the claimant's pension plan is funded by contributions from [Employer].

. . . .

j. Mr. Stover could not comment that it would be improper to use a service-based methodology as Ms. Gramer used to determine what portion of claimant's pension was funded by [Employer]. Mr. Stover specifically

4. More precisely, Claimant appears to have worked for Employer for thirteen years and five months. While Ms. Granger appears to have been familiar with the dates of Claimant's employment, the record does not reveal why she characterized the length of this period to be 13.75 years. (*See* Granger Dep. at 15.) We note, however, that neither party has argued that this characterization is incorrect for determining credited service under the Plan.

5. Ms. Gramer explained that, in arriving at the conclusion that 51.12% of Claimant's total

monthly pension benefits are attributable to Employer, she considered the years of service Claimant worked for Employer and other employers contributing to the Plan and the benefit rate for each of those years. (Gramer Dep. at 13–17.) Therefore, although Claimant worked only 13.75 of his 31.25 credited years for Employer, 51.12% of his pension benefits are attributable to Employer because the benefit rate was higher during the years that Claimant worked for Employer. (Gramer Dep. at 15–19.)

stated he would not debate Ms. Gramer's determination of a 51.12% portion. (FOF ¶¶ 10 (d, g, j.)) The WCJ found Mr. Stover's testimony credible.

The WCJ concluded that Employer was not allowed to receive recoupment for the period preceding Employer's issuance of its notification that it would be taking credit. The WCJ also concluded that "Employer is not limited in its credit to the amount it actually contributed to the [Plan]." (WCJ Decision, Conclusion of Law (COL) ¶ 5.) Accordingly the WCJ concluded:

> The calculation of [a] 51.12% contribution rate by [Employer that was] made by Ms. Gramer is [in] accord with Section 204(a) of the Pennsylvania Workers' Compensation Act, as amended, and Title 34 Section 123.10 and shall not be disturbed by the undersigned. Ms. Gramer explained in her deposition how she arrived at the 51.12% figure, and Mr. Stover, the comptroller, specifically noted he would not dispute her calculation. Consequently, [Employer] is entitled to a 51.12% credit from the pension, which has been correctly calculated as a weekly credit of $139.74.

(COL ¶ 2.)

The WCJ concluded that Employer was entitled to a credit of $139.74 per week from March 11, 2003 through August 15, 2004. The WCJ concluded that Employer was entitled to a total credit of $11,318.94.

The WCJ ordered Employer to pay Claimant $2,370.29—the amount in excess that Employer had already recouped as of the time of the order. Both Claimant and Employer filed petitions for review with the Board.

The Board reversed the WCJ's decision to the extent that it denied Claimant's Review Petition. The Board concluded that Ms. Gramer's testimony was incompetent because it was not consistent with 34 Pa.Code § 123.10. The Board stated that Ms. Gramer did not base her calculations on the actual amounts contributed by Employer, despite the requirement in 34 Pa. Code § 123.10(a) that she do so. The Board noted that Mr. Stover testified that he kept records as to "the hours worked by each employee for each company for each period of employment, and the applicable contribution rate for each such period," which would have allowed Employer's actual contribution to be "easily inferred." (Board Op. at 9.) Nonetheless, the Board noted that Ms. Gramer refused to consider this evidence. Accordingly, the Board granted Claimant's petition for review, reversed the WCJ's order to the extent that it denied, in part, the Review Petition, and denied Employer's petition for review.[6] The Board also found that *Hensal* was not controlling because *Hensal* involved a *multiple* employer pension plan, whereas this case involved a *multi*-employer pension plan.[7]

---

6. The Board also identified two issues which, based on its decision, it did not have to and, therefore, would not address: (1) Claimant's denial of due process argument; and (2) Employer's challenge as to the timing and extent of the offset.

7. This Court, in *Hensal,* succinctly described the difference between multi-employer and multiple employer plans:

> A multi-employer pension plan is one to which "more than one employer is required to contribute and is maintained under one or more collective bargaining agreements between one or more employe[e] organizations and more than one employer." 34 Pa.Code § 123.2. Although not defined, a multiple employer pension plan is maintained by one or more employers where participation is not linked to a collective bargaining agreement.

*Hensal,* 911 A.2d at 228 n. 5 (alteration in original).

Employer now petitions this Court for review of the Board's order.[8] Employer argues that the Board erred in holding that Ms. Gramer's testimony was not sufficient to support Employer's right to an offset. Employer also argues that the Board erred in raising this issue *sua sponte*.

Employer first argues that the Board erred in holding that Ms. Gramer's testimony was not competent to support Employer's right to an offset because Ms. Gramer's testimony did not comport with the requirements of the Bureau's regulation at 34 Pa.Code § 123.10 and Section 204(a) of the Act. Employer argues that *Hensal* controls in this case. We agree with Employer.

In *Hensal,* this Court addressed the question of "how an employer proves the extent to which it funded a defined benefit pension plan so as to qualify for" an offset pursuant to Section 204(a). *Hensal,* 911 A.2d at 226. *Hensal* dealt with a request by the employer in that case, Pennsylvania State University (PSU), to take an offset against its workers' compensation payments to the claimant in that case, Robert Hensal (Hensal), due to Hensal's receipt of a multiple employer defined benefit disability pension from the State Employees' Retirement System (SERS). PSU adduced the testimony of SERS' actuary and of the Director of SERS' Benefits Determination Division. SERS' Director testified that both Hensal and PSU contributed to the SERS plan and that SERS calculated PSU's offset using an actuarial formula that subtracted "from the total value of [Hensal's] actuarially determined projected lifetime benefit the specific amount [Hensal] contributed, plus an actuarially

determined investment rate of return." *Id.* at 229. SERS' actuary testified that this method was "reasonable and actuarially sound." *Id.* at 230. Notably, SERS' actuary also testified that "employer contributions to the [SERS] fund in any given year are irrelevant to calculating an offset because past or future employer contributions maintain adequate funding." *Id.* This Court concluded that PSU's evidence was "legally sufficient to establish the extent to which [PSU] funded [Hensal's] defined benefit pension for purposes of offset." *Id.* at 232.

Here, the Board distinguished *Hensal* on the basis that *Hensal* dealt with a *multiple employer* defined benefit plan, to which 34 Pa.Code § 123.10 did not apply, while the current case deals with a *multi-employer* defined benefit plan, to which 34 Pa.Code § 123.10 does apply. (Board Op. at 9–11.) The Board read *Hensal* as merely filling a gap left by the failure of the Bureau's regulations to address the calculation of offsets for multiple-employer plans. This Court reads *Hensal* more broadly. The rationale of this Court's holding in *Hensal* is applicable to *all* collectively-funded defined *benefit* plans, not merely to multiple employer plans:

> An employer is required to contribute funds to the defined benefit pension plan to cover the difference in employee contributions and the collective pension liability. An employer's liability to fund an employee's defined benefit pension is not complete until the employee dies. . . . Because the pension guarantees a fixed benefit level, the employer assumes the risks of investment, inadequate funding, and member longevity.

---

8. The Board granted rehearing before the parties filed their briefs with this Court and issued a decision on November 5, 2007, reaching the same outcome and conclusions as in its previous decision. Employer filed a new petition for review with this Court after this rehearing decision.

Further, defined benefit plans are funded collectively, the employer's contributions being pooled in a common trust fund from which all participants receive their benefits. In theory, economies of scale and other efficiencies are achieved by investing in a single common pool. Also, longevity risk is tempered by a larger and more diverse pool of participants....

In sum, collective funding and the potential for post-retirement funding create unique hurdles to proving an employer's defined benefit contribution for pension offset purposes. Because an appreciation of the funding of defined benefit pension plans requires knowledge beyond that possessed by laypersons, it is a subject particularly amenable to testimony by experts.

*Hensal*, 911 A.2d at 231–32. Here, when questioned on cross-examination as to why she did not look at the actual dollar amounts paid into the Plan by Employer during the years Claimant was working for Employer, Ms. Gramer testified that this information was not relevant because, as a defined benefit plan, all assets of the Plan are available to all of the Plan's participants. (Gramer Dep. at 23.) On redirect examination, Ms. Gramer further clarified this point:

[The Plan] is a defined benefit plan, and the assets that are in the plan are available to pay the benefits of all participants.

It's not like a defined contribution plan where assets are earmarked for a specific participant and put into a special account attributable only to that person.

So that contributions that [Employer] made in prior years may have had actuarial gains attributable to them or other reasons that contributions in the past may be paying benefits in the future.

For instance, when there is a benefit increase that applies across the board to all participants, that benefit increase is—when contributions are determined, is amortized over a 30–year period.

So contributions of—benefits that accrue in a particular year aren't necessarily connected with contributions made in a particular year for a defined benefit plan.

(Gramer Dep. at 24–25.) Ms. Gramer testified that she believed the service-based methodology was the most appropriate approach to calculate the portion of Claimant's benefits attributable to Employer. (Gramer Dep. at 11.) Ms. Gramer testified that this method was designed, in part, to ensure that Employer did not get credit for the portion of Claimant's benefit attributable to Claimant's prior employers. (Gramer Dep. at 28.) Such testimony is similar to the testimony this Court accepted in *Hensal* and is competent testimony under Section 204(a) of the Act and 34 Pa.Code § 123.10 to support Employer's right to an offset.

Claimant argues that Ms. Gramer's testimony does not conform to the requirements of 34 Pa.Code § 123.10(a) because she did not consider "only that amount which is contributed by the" Employer in calculating the offset. 34 Pa.Code § 123.10(a). We do not agree that the Act requires testimony as to the dollar amount paid into a plan by an employer. As this Court stated in *Hensal*, "[s]ince an employer cannot provide evidence of actual contributions for the use of an individual member of a defined benefit pension plan, it may meet its burden of proof ... with expert actuarial testimony." *Hensal*, 911 A.2d at 232. We do not believe this holding is inconsistent with 34 Pa.Code § 123.10. Where, as in this case, Claimant has not contributed to the multi-employer defined benefit pension plan, the service-based methodology utilized by Ms. Gramer is a reasonable way to ensure that Em-

ployer gets credit only for that part of Claimant's pension for which it is responsible and not for that part of his pension which Claimant earned while working for another employer. (Gramer Dep. at 11, 28.) Moreover, in this case, Ms. Gramer, the actuary of the Plan, stated that making a calculation based on the money paid into the Plan by Employer over a particular period of time would not be a viable method of calculating the offset. Given this statement, the fact that Employer may not adduce the testimony of *any* actuary, but must use the opinion of the Plan's actuary, per 34 Pa.Code § 123.10(b), and that the methodology utilized by Ms. Gramer is a reasonable manner of allocating the portions of Claimant's pension attributable to Employer and Claimant's previous employers, we must hold that the Board erred in refusing to accept Ms. Gramer's testimony as sufficient to establish Employer's right to an offset, and we must reverse the Board on this issue.[9]

For these reasons, we reverse the order of the Board, and we remand this matter to the Board to consider the issues it declined to reach in its prior opinion.

### *O R D E R*

NOW, March 5, 2009, the order of the Workers' Compensation Board of Appeal in the above-caption matter is hereby **REVERSED,** and this matter is **REMANDED** to the Board so that it may dispose of the remaining issues raised by Donald Albani, and so that it may dispose of the issues raised by Consolidation Coal Company regarding the extent and timing of Consolidation Coal Company's offset.

Jurisdiction relinquished.

---

9. Due to our holding on this issue, we do not reach Employer's argument that the Board erred by raising the issue of the competency of Ms. Gramer's testimony *sua sponte.*